# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### LEWIS T. BABCOCK, JUDGE

Civil Action No. 06-cv-00659-LTB

STEPHEN STARKEY, and
BEDRA STARKEY, on behalf of themselves and on behalf of
JENNIFER STARKEY,
ALYSSA STARKEY, and
JOHN STARKEY,

      Plaintiffs,

v.

DOREEN MILLER,
BRIAN RUSSELL,
HOLLY SMITH,
BARBARA PARK,
JULIE KINTZING, and
ANN BALDWIN, in their individual capacities,

      Defendants.

_____

# ORDER
_____

      This parental and religious rights case is before me on Defendants' Motion for Summary Judgment [**Docket # 34**], Plaintiffs' Response [**Docket # 38**], Defendants' Reply [**Docket # 40**], Defendants' Motion to Strike Sham Affidavits [**Docket # 41**], and Plaintiffs' Response to Defendants' Motion to Strike Sham Affidavits [**Docket # 43**]. Oral argument would not materially assist the determination of these motions. After consideration of the motions, the papers, and the case file, and for the reasons stated below, I GRANT in part and DENY in part Defendants' Motion to Strike Sham Affidavits [**Docket # 41**], and GRANT in part and DENY in part Defendants' Motion for Summary Judgment [**Docket # 34**].

## I. BACKGROUND

      The relevant facts are as follows. Plaintiffs contend Defendants have deprived Plaintiffs

Stephen Starkey ("Stephen") and his wife Bedra Starkey ("Bedra") (collectively "the Starkeys") of parental rights and visitation with Stephen's children, Plaintiffs Jennifer, Alyssa, and John Starkey (collectively "the children"). Plaintiffs also assert Defendants have deprived the children of visitation with the Starkeys. Plaintiffs allege Defendants conspired against them by falsifying facts in a Colorado state child welfare proceeding ("underlying case") in an effort to discriminate against Plaintiffs for their fundamentalist Pentecostal religion. In essence, Plaintiffs charge Defendants with religious persecution under the color of state law in violation of the First and Fourteenth Amendments. Plaintiffs also seek tort damages under Colorado state law for breach of fiduciary duty, defamation, negligence, infliction of emotional distress, and conspiracy. On November 11, 2006, I dismissed all of Plaintiffs' claims against Boulder County Department of Social Services ("BCDSS") and Defendants in their official capacities under the Eleventh Amendment and dismissed Plaintiffs' injunctive relief claim as overbroad and speculative.

The underlying case was initiated when the Boulder County Department of Social Services ("BCDSS") received a call on August 20, 2004, from one of the children—then ages 13, 11, and 9—stating they were going to run away from the Starkey home. Officer Stoneking of the Lafayette Police went to the Starkey home and interviewed the children. According to the police report, the children reported Stephen spanked them as often as every day, hit them in the head with rings on his fingers, made them lay face down on the floor or stand facing against the wall for hours, deprived them of food, frequently yelled at them, and inflicted other punishments. All three stated they feared their father and wanted to be removed from his home. Stoneking took the children to the Lafayette Police Department for further investigation.

When notified, Stephen came to the Police Department and stated the children were lying. Upon being interviewed later, however, Stephen admitted to hitting John Starkey. He also

admitted that a prior court order prohibited him from spanking his children, but he did not feel that hitting his children on the buttocks qualified as "spanking." Stephen stated he believed in corporal punishment and that children should fear their parents—and would not fear their parents if they were not spanked. Stephen said that if he was not allowed to spank his children, they were destined for a life of sin and immorality. Stephen agreed to allow the children to stay with their biological mother, Susan Koslowski ("Koslowski"). Officer Stoneking charged Stephen with three counts of child abuse. Stephen pled no contest to the charges.

A hearing on a Motion for Emergency Protective Orders was held on August 25, 2004, in Boulder County District Court ("Boulder court"). At that hearing, the Boulder court expressed concerns for the children's safety and placed them in the custody of BCDSS. The Boulder court ordered psychological evaluations and supervised visitation for both biological parents. On September 1, 2004, the Boulder court entered a temporary custody order memorializing these prior orders and finding the children were seriously endangered. The children were adjudicated dependent and neglected on September 23, 2004.

After the August 25, 2004, hearing, Defendant Miller ("Miller") was assigned as caseworker. The outgoing caseworker reported to Defendant Miller: "Father uses excessive discipline and there are concerns around his mental stability. There is a significant history with DSS. All children appear to have been suicidal at some point in the past. They fear their father and are worried he will abduct them. John has been hospitalized in the past and can be aggressive towards others. . . . High concerns around Mr. Starkey's emotional stability and he has a history of being volatile." [**Docket # 34-7**].

The Starkeys agreed to a treatment plan that was adopted by the Boulder court on November 4, 2004. As part of the plan, Stephen agreed to mental health treatment and to

acknowledge his responsibility for the fear his children had of him. He agreed to write a letter to the children taking full responsibility and apologizing for his abuse. He agreed to use no corporal punishment in the event he was ever allowed unsupervised contact.

Leading up to the November 4, 2004, hearing, Stephan was evaluated by Dr. Pinto, a licensed psychologist. Dr. Pinto noted that the children's biological mother had alleged Stephen sexually abused Jennifer, but there had been no proof of that. Dr. Pinto wrote:

> it is difficult for Stephen to recognize his own foibles and the impact of his behavior on the children. . . . The children are very clear that they have felt too afraid to report their father and have been told by him that to divulge any information outside of the family could result in further punishment. . . . [H]e has tried to raise the children in isolation of a cult of one. . . . While Stephen does not show all of the characteristics of paranoid schizophrenia, this indeed may be possible. He does show a strong delusional system regarding both his relationship with God and in terms of his paranoia regarding others. This has led him to be an abusive individual, both physically, emotionally and spiritually. . . . He has engaged with his children in medical and educational neglect by not providing them with treatment or care when the school has recommended it. . . . The children are not seen as lying at this point, nor as being coached by their mother. . . . The children are reluctant to see their father unless it is supervised and with rules. The see their father as fairly omnipotent and dangerous to themselves and others.

[**Docket # 34-16**]. Dr. Pinto recommended the children not be returned to Stephen's care.

The case was reviewed at a permanency hearing on January 25, 2005. Defendant Miller drafted a family services plan which the Boulder court approved without objection. The Boulder court found that returning the children to the Starkeys was not appropriate at that time. At that hearing, Defendant Russell—a secondary caseworker filling in for Defendant Miller—stated: "The children have expressed a great deal of fear of their father and they've said they do not want to visit with him although at times they vacillate, you know, wondering what it would be like and are dealing with those issues in therapy." [**Docket # 34-19**].

In February 2005, the case was transferred to another caseworker, Dusti Moats, who is not named in this litigation. Neither Defendants Miller nor Russell, nor Defendant Smith who was

their supervisor, had further involvement in the case. Contemporaneous with the transfer, Stephen completed his letters of apology on February 15, 2005. The children wrote letters stating they did not want to see Stephen on February 18, 2005.

On June 15, 2005, Jennifer Starkey was returned to the physical custody of her biological mother, Susan Koslowski. On June 30, 2005, the other children were also returned to Koslowski's custody. The Boulder court gave the Starkeys joint custody with Koslowski on July 11, 2005.

Also on June 15, 2005, the case was transferred from Dusti Moats to Defendant Kintzing, with Defendant Park as her supervisor. In a July 21, 2005, report, Defendant Kintzing—citing Dusti Moats—noted that Jennifer Starkey had disavowed some of her earlier statements on May 28, 2005. Specifically, Jennifer reported she had not been put on time outs for hours at a time or had food withheld, and had exaggerated her prior claims out of fear and anger. Jennifer requested unsupervised visitation. Alyssa Starkey also stated the prior statements were exaggerations. John Starkey maintained Stephen hit John in the head when Stephen was angry.

On September 9, 2005, Jennifer Starkey was hospitalized at Exempla Lutheran Hospital ("Exempla") for anxiety attacks. Jennifer was subsequently placed inpatient at Colorado Mental Health Institute Fort Logan ("Ft. Logan") for two weeks. According to Defendant Kintzing, Koslowski called her to inform her of the hospitalization and told her the hospital psychiatrist felt Jennifer was in "serious shape" due to a severe anxiety attack and recommended Jennifer be placed in therapy and not have unsupervised contact with Stephen. Kintzing confirmed this information with the hospital. Koslowski also told Kintzing that Stephen had "used emotional religious abuse on them all in the past." Kintzing contacted the Starkeys' family therapist, Joe O'Cleary. According to Kintzing's report, O'Cleary told her he spoke with Stephen who

informed O'Cleary that Jennifer was going through a religious conversion reaction related to accepting Christ, and was not having an anxiety attack.

Kintzing contacted the Boulder court. The Boulder court issued temporary protective orders on September 9, 2005, giving temporary custody of the children to Koslowski and allowing supervised contact with Stephen. The Boulder court held an emergency custody hearing on September 12, 2005. At that hearing, the attending physician from Exempla, Dr. Stackpool, testified he believed Jennifer's anxiety attack was related to her recent unsupervised visit with her father and he felt unsupervised visitation was inappropriate at that time. Dr. Stackpool testified it was his understanding from speaking to a hospital counselor that Jennifer had only recently been returned to the care of her father and that, upon her return, she had been subject to a "spiritual cleansing" immediately preceding the anxiety attack. Dr. Stackpool also testified that Koslowski told him Jennifer had been emotionally and spiritually abused by Stephen previously.

At the September 12, 2005, hearing, the Boulder court heard testimony from Dr. Konlos-Hrobsky, John Starkey's therapist. Dr. Konlos-Hrobsky testified that John—accompanied by Koslowski—had visited her on August 2, 2005, for an intake interview. John told Dr. Konlos-Hrobsky that he was told she would give him ADHD medication that would kill him. Koslowski stated this information came from Stephen—who had showed John a website about ADHD drugs. John confirmed the information came from the internet. Stephen testified he had shown the information to John.

Following the September 12, 2005, hearing, temporary orders were entered placing the children in the custody of Koslowski with supervised visitation allowed with the Starkeys. The judge ordered additional BCDSS and family therapist supervision outside of the presence of the Starkeys or Koslowski. The judge adopted the recommendations of Defendant Kintzing. The

judge ordered the Starkeys to limit their discussion of religion with the children unless the children elicited such conversation but left the determination of the contours of such limitation—and discretion to otherwise amend the visitation plan—to the guardian ad litem and Defendant Kintzing.

The court held a temporary custody hearing regarding Jennifer Starkey on September 21, 2005. At that hearing, Mary Hamilton—a psychiatrist nurse practitioner caring for Jennifer at Ft. Logan—testified Jennifer was overwhelmed by the chaos in her family and that she was fearful of her father. Hamilton stated that at various points in her treatment at Ft. Logan, Jennifer had expressed an interest in living with her mother, living with her father, and living in a foster home. Hamilton stated it was her opinion that Jennifer would best be served by living in a foster home. Hamilton testified Kintzing told her it was Stephen's responsibility that Jennifer was in the hospital.

At the September 21, 2005, hearing, the Starkeys' attorney, Samuel Ventola, made offers of proof that Stephen would testify Jennifer expressed a desire to live with him and Jennifer told Stephen that her anxiety was the result of apprehension regarding being returned to Koslowski's home. Ventola also made an offer of proof that Jennifer told him she was concerned Defendant Kintzing was not accurately reporting what Jennifer was saying and that Stephen was in no way responsible for her anxiety attacks. Instead, Ventola stated Jennifer told him the anxiety was caused by issues in the Koslowski home. Ventola stated Jennifer told him she wanted to return to her father's home rather than her mother's or foster care. Ventola made an offer of proof that Alyssa Starkey and Ryan Starkey—Stephen's child from a prior marriage—would confirm Jennifer's positions. Ventola also confirmed Stephen had unsupervised telephone contact with Jennifer, despite the Boulder court order allowing only supervised contact.

The Boulder court found removal from Koslowski's custody and placement with BCDSS was in Jennifer's best interests. On December 23, 2005, the court returned Jennifer to Stephen's custody. The court terminated its jurisdiction on April 13, 2006.

Plaintiffs filed this action on April 7, 2006. Plaintiffs' amended complaint [**Docket # 4**] alleges Defendants conspired to deprive the Starkeys and the children of their mutual rights because Defendants disapprove of Plaintiffs' religious views. Defendants filed for summary judgment on September 11, 2007 [**Docket # 34**]. In addition to arguing Plaintiffs have failed to demonstrate the existence of a genuine issue of material fact as to the federal claims, Defendants assert the defenses of collateral estoppel and qualified immunity. As to the state claims, Defendants assert an immunity defense under the Colorado Government Immunity Act, COLO. REV. STAT. § 24-10-101, *et seq.*

## II. STANDARDS OF REVIEW

### A. Summary Judgment

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is not proper if—viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor—a reasonable jury could return a verdict for that party. *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992).

The non-moving party has the burden of showing there are specific issues of material fact to be determined. *Celotex*, *supra*, 477 U.S. at 322. A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986).  It is not enough that the evidence be merely colorable.  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is therefore appropriate only if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Lucas v. Mountain States Tel. & Tel.*, 909 F.2d 419, 420 (10th Cir. 1990); FED. R. CIV. P. 56(c).

In a motion for summary judgment, I view the evidence "through the prism of the substantive evidentiary burden." *Liberty Lobby*, *supra*, 477 U.S. at 254.  The inquiry is based on "the quality and quantity of evidence required by the governing law" and "the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant."  *Id*.  Accordingly, in this civil rights case, Plaintiffs must show material facts in dispute by a preponderance of the evidence in order to defeat Defendants motion for summary judgment.  Plaintiffs meet this burden if they set forth evidence that—if believed by the ultimate factfinder—makes it more likely than not Defendants acted in the manner alleged in the complaint.


B.  Qualified Immunity

The doctrine of qualified immunity shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law.  *Elder v. Holloway*, 510 U.S. 510, 512 (1994).  I initially consider the threshold question of whether—taken in the light most favorable to the party asserting the injury—Plaintiffs allege sufficient facts to show Defendants' conduct violated Plaintiffs' constitutional rights.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the answer to the first question is yes, I then ask if the right was clearly established.  *Id*.  Finally, if Plaintiffs meet their burden under these two inquiries, the burden then shifts to Defendants to

"demonstrate that 'no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and information the defendant possessed at the time of his actions.'" *Hollingsworth v. Hill*, 110 F.3d 733, 738 (10th Cir. 1997) (quoting *Guffey v. Wyatt*, 18 F.3d 869, 871 (10th Cir. 1994)).

### C. Collateral estoppel under Colorado law

The doctrine of collateral estoppel may be invoked to bar relitigation of factual issues determined in a prior judgment. *See In re Wallace*, 840 F.2d 762, 764 (10th Cir. 1988). When a federal court considers the collateral estoppel effect of a prior state court judgment, the full faith and credit provision of 28 U.S.C. § 1738 requires the federal court to give the state court judgment the same preclusive effect as the state rendering the judgment would give. *See Bolling v. City & County of Denver*, 790 F.2d 67, 68 (10th Cir. 1986). Nonetheless, collateral estoppel is an equitable doctrine applied at the court's discretion and need not be applied in every case in which it could be applied. *Arapahoe County Public Airport Auth. v. F.A.A.*, 242 F.3d 1213, 1220 (10th Cir. 2001); *W. Group Nurseries, Inc. v. Pomeranz*, 867 P.2d 12, 15 (Colo. Ct. App. 1993).

As this action arises out of judgments of a Colorado District Court, Colorado law determines the preclusive effect accorded. Under Colorado law, the doctrine of collateral estoppel "bars relitigation of an issue if: (1) The issue precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) The party against whom estoppel was sought was a party to or was in privity with a party to the prior proceeding; (3) There was a final judgment on the merits in the prior proceeding; (4) The party against whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior proceeding." *Bebo Constr. Co. v. Mattox & O'Brien, P.C.*, 990 P.2d 78, 84–85 (Colo. 1999).

### III.  ANALYSIS

## 1. Rule 56(f) affidavit of Samuel Ventola [**Docket # 38-13**]

Plaintiffs have filed a Rule 56(f) affidavit claiming Defendants have redacted portions of the discovery provided such that Plaintiffs are limited in their ability to present evidence in opposition to Defendants' pending motion for summary judgment. When a nonmovant files an affidavit under Rule 56(f), the party invokes the Court's discretion. *Patty Precision v. Brown & Sharpe Mfg. Co.*, 742 F.2d 1260, 1264 (10th Cir. 1984). Rule 56(f) allows a court to stay or deny a summary judgment motion in order to permit further discovery if the nonmovant states by affidavit that it lacks facts necessary to oppose the motion. *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000). In order to be afforded relief, the nonmovant must identify the probable facts not available and what steps have been taken to obtain those facts. *Id.* The nonmovant also must explain how additional time will enable him to rebut the movant's allegations of no genuine issue of fact. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992). If the desired discovery would not contradict the moving party's contention that there is no question of material fact, Rule 56(f) relief should not be granted. *Jones v. City and County of Denver*, 854 F.2d 1206, 1211 (10th Cir. 1988)

Generally, affidavits submitted under Rule 56(f) are entitled to liberal treatment unless they are dilatory or meritless. *Id.* When a party—such as Plaintiffs here—seeking damages from a government official files a Rule 56(f) affidavit in response to a qualified immunity defense, however, review is more restrictive because "insubstantial lawsuits 'against government officials should be resolved prior to discovery and on summary judgment if possible.'" *Id.* at 1211 (10th Cir. 1988) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)). Thus, where the defendant asserts a qualified immunity defense, the nonmoving party filing a Rule 56(f) affidavit must demonstrate with specificity how discovery will enable him to rebut a defendant's showing

of objective reasonableness.  *Campbell, supra*, 962 F.2d at 1523 n.7 (citing *Jones*, 854 F.2d 1206 at 1211).

Plaintiffs' affidavit does not demonstrate with particularity how additional discovery would raise a genuine issue of material fact as to Defendants' qualified immunity claim.  *See Lewis v. City of Ft. Collins*, 903 F.2d 752, 758–59 (10th Cir. 1990).  Plaintiffs claim the redacted portions of discovered documents would reveal the identity of those persons upon whom Defendants relied when acting in the contested manner.  Plaintiffs have not, however, explained how any specific document or missing information will address the objective reasonableness of Defendants' actions.  Rule 56(f) is not a license for a fishing expedition, especially when summary judgment is urged based on a claim of qualified immunity.  *Id.* at 759.  Accordingly, I find no reason to delay the adjudication of Defendants' summary judgment motion.

### 2.  Motion to Strike Sham Affidavits [**Docket # 41**]

Defendants move to strike the affidavits of Stephen, Bedra, and Jennifer Starkey submitted with Plaintiffs' response to Defendants' motion for summary judgment.  I note initially that the affidavits do not appear to be sworn before someone who is authorized to administer an oath and may be stricken *sua sponte* on that basis alone.  *See, e.g., Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006); *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985).  However, as Defendants do not object to the form of the affidavits in this regard, I will consider such objection waived for the purposes of this motion only.  *See Associated Press v. Cook*, 513 F.2d 1300, 1303 (10th Cir. 1975).

Defendants object to the affidavits on grounds that the affidavits are submitted in an attempt to create a sham issue of fact.  "Factors relevant to the existence of a sham fact issue include whether the affiant had access to the pertinent evidence at the time of his earlier testimony

or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

An affidavit submitted in opposition to a motion for summary judgment must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995). Where an affidavit contains merely generalized, unsubstantiated claims not based on personal knowledge, such affidavit does not create genuine issues of material fact as to those claims. *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995). Inadmissible hearsay may not be included in an affidavit to defeat summary judgment because a third party's description of a witness's supposed testimony is not suitable grist for the summary judgment mill. *Id*. at 485. Accordingly, affidavits that contain speculation or hearsay without factual support, and statements in an affidavit prefaced by the phrases "I believe" or "upon information and belief" or those made upon an "understanding," are also properly subject to a motion to strike. *Tavery v. United States*, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994) (citing *Carey v. Beans*, 500 F. Supp. 580, 583 (E.D. Pa. 1980)). Likewise, affidavits which contain conclusions of law or ultimate facts, or contain arguments and inferences, should be struck. *See Carey*, 500 F. Supp. at 583 (discussing cases).

Applying the foregoing rules to the affidavits at issue here, I do not find the affidavits should be stricken in their entirety. However, the affidavits must be stricken in part as follows:

*a. Affidavit of Stephen Starkey [**Docket # 38-2**]*

1. Paragraph 6: The phrase "these concerns were ignored" is stricken as a conclusion of law or ultimate fact based upon speculation and for lack of personal knowledge.

2.  Paragraph 8—with the exception of the introductory sentence—is stricken as a conclusion of law or ultimate fact based upon speculation and for lack of personal knowledge.

3.  Paragraph 9—with the exception of the introductory sentence—is stricken as speculative and not based upon personal knowledge.

4. Paragraph 10—with the exception of the introductory sentence—is stricken as a conclusion of law or ultimate fact based upon speculation and for lack of personal knowledge.

5.  Paragraph 11—with the exception of the introductory and final sentences—is stricken as a conclusion of law or ultimate fact based upon speculation and for lack of personal knowledge.

6.  Paragraph 12 is stricken in its entirety as a statement of speculation or belief and as a conclusion of law or ultimate fact.

### b.  Affidavit of Jennifer Starkey *[Docket # 38-10]*

1.  Paragraph 2 is stricken in its entirety as a statement of speculation or belief without personal knowledge and as a conclusion of law or ultimate fact.

2.  Paragraph 3 contains speculative statements and conclusions of law or ultimate fact and is partially stricken to read as follows: "Previous statements I made against my father which resulted in charges being made against him were false.  I made the previous false charges because [I was] angry at my father because of strict consequences he imposed on [me] because of [my] conduct."  The remainder of Paragraph 3 is stricken.

3.  Paragraph 4 contains speculative statements of belief and inadmissible hearsay and is partially stricken to read as follows: "At one point, Doreen Miller placed me with a foster parent, Kathy Grace.  The teachings I was given [at Grace's church] contradicted my family's Christian faith.  Ms. Miller also told me that I should not tell anyone that I had been placed with Ms. Grace,

or the judge in my case would not allow me to return home."

4. Paragraph 5: The phrase "but my statements were ignored" is stricken as a conclusion of law or ultimate fact based upon speculation and for lack of personal knowledge.

5. Paragraph 6—with the exception of the phrase "I was later placed in a group home"—is stricken as a conclusion of law or ultimate fact based upon speculation and for lack of personal knowledge.

6. Paragraph 7 is stricken in its entirety as a conclusion of law or ultimate fact.

*c. Affidavit of Bedra Starkey [**Docket # 38-11**]*

The affidavit of Bedra Starkey is accepted as submitted with the exception of the final sentence of paragraph 4 which is stricken as a conclusion of law or ultimate fact based upon speculation and for lack of personal knowledge.

3.  Motion for Summary Judgment—Deprivation of Constitutional Rights [**Docket # 34**]

As an initial matter, I note that Plaintiffs, in opposing summary judgment, direct me to numerous pages of evidence that do not appear to exist in the record before me. For example, Plaintiff cites to Exhibit K, BCDSS page numbers 1390, 1543, 1549, 1552, 1557, and 1580—none of which appear in Exhibit K. I consider this summary judgment motion only in light of those records I have, and ignore Plaintiffs' repeated reference to those records allegedly in their possession but not provided to this Court. In addition, as all claims against Boulder County Social Services and Defendants in their official capacities have been dismissed in this matter, Plaintiffs' allegations regarding these parties do not implicate the Defendants in their individual capacities.

As the party seeking summary judgment, Defendants bear the initial responsibility of informing the Court of the basis for their motion and identifying those portions of the record that

demonstrate the absence of genuine issues of material fact. *Celotex, supra,* 477 U.S. at 323. It is not necessary that Defendants support their motion with affidavits or similar materials negating the nonmoving party's claims. *Id.* "In cases . . . where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may be properly made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* at 323. Such a motion—whether or not accompanied by affidavits—will be considered made and supported as provided by Rule 56. *Id.* The nonmoving party then bears the burden of pointing to specific facts showing there is a genuine issue for trial. *Id.*

In Defendants' Answer to the Amended Complaint First Claim for Relief [**Docket # 16**], Defendants deny the allegations of the complaint. Defendants again deny those allegations in their motion for summary judgment and provide evidence they should be entitled to qualified immunity because Plaintiffs' constitutional rights were not violated and—even if Plaintiffs' rights were violated—Defendants' actions were not unreasonable [**Docket # 34**]. Accordingly, Defendants meet their minimal responsibility of informing the Court of the basis for their motion and identifying those portions of the record that demonstrate the absence of genuine issues of material fact. *See Celotex, supra,* 477 U.S. at 323. The burden therefore is on Plaintiffs to show the existence of genuine issues of fact for trial. *Id.* Plaintiffs do not meet this burden.

Plaintiffs allege Defendants conspired to deprive the Starkeys and the children of their parental rights because Defendants disapproved of Plaintiffs' religious views. Plaintiffs—in addition to the general allegation—allege the following specific acts as proof of the conspiracy: (1) Dr. Pinto described Stephen as "delusional," his religion as a "cult of one," and described Bedra as "dependent" on Stephen for her religious views; (2) Defendants kept the children from Bedra even though Bedra had never been accused of any misconduct; (3) Defendants continued to

keep the children from Stephen even after the children reported their previous claims of abuse were false and exaggerated; (4) Defendant Miller selected a foster parent for Jennifer who went to the same church as Defendant Miller and instructed Jennifer not to tell anyone this or the judge would not allow Jennifer to return home; (5) Defendants Park and/or Kintzing told Ft. Logan that Jennifer had been abused by Stephen and had been subject to a "spiritual cleansing" upon her return to Stephen's custody after a ten month hiatus; (6) Defendant Kintzing suggested to Jennifer that Stephen had raped her and, upon Jennifer's denial of same, shouted at Jennifer and told Jennifer and Jennifer's therapist that Jennifer should not defend Stephen; (7) Defendants Park, Kintzing and/or Baldwin tried to place the children in foster care or their mother's care despite known dangers to the children's safety from such placement; (8) Defendants Park, Kintzing and/or Baldwin caused Jennifer to be placed on medication; (9) Defendants Park and/or Kintzing sought to prevent the Starkeys from discussing religion with the children; (10) Defendants Park and Kintzing issued a finding that the children had been emotionally abused and medically neglected, despite the lack of evidence supporting such findings; (11) Defendants Park and Baldwin have threatened to interfere with Bedra's plans to adopt the children.

It is the duty of the parties, not the Court, to provide and point to evidence in the record supporting their positions. *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513–14 (10th Cir. 1990). It is not this Court's task to comb through Plaintiffs' submissions in an effort to link alleged facts to their arguments. *Barcikowski v. Sun Microsystems, Inc.*, 420 F. Supp. 2d 1163, 1169 (D. Colo. 2006). Plaintiffs direct me to no evidence—other than the bare assertions in the complaint—supporting their position that Holly Smith, Barbara Park, or Ann Baldwin acted in a manner that deprived Plaintiffs of their constitutional rights. These bare allegations are insufficient to overcome a motion for summary judgment. *See Sullivan v. Scoular Grain Co. of*

*Utah*, 930 F.2d 798, 800 (10th Cir. 1991) ("A nonmoving party cannot survive a motion for summary judgment based on bare allegations in the pleadings without supporting evidence."). Accordingly, I GRANT summary judgment as to these three defendants.

The only evidence provided as to Brian Russell is Stephen Starkey's statement in his affidavit that he told Russell he believed the children's placement in Koslowski's home exposed the children to illegal drug and alcohol use, swearing, smoking, mold, inappropriate music, and a caretaker who subjected the children to abuse. Plaintiffs direct me to no evidence Russell acted in any manner that deprived Plaintiffs of their constitutional rights. Accordingly, I GRANT summary judgment as to Defendant Russell.

I address the allegations as to the remaining two Defendants in turn.

### a. Doreen Miller

Plaintiffs allege Defendant Miller conspired to deprive the Starkeys and the children of their rights because she disapproved of the Starkeys' religious beliefs. Specific alleged actions demonstrating the conspiracy include Miller's participation in the decision to keep the children away from the Starkeys, selecting an unqualified foster parent—Kathy Grace—for Jennifer because Grace attended the same church as Miller and thereby subjecting Jennifer to theology that contradicted her personal faith, and telling Jennifer she could not tell anyone she had been placed with Grace or the judge would not allow her to return home.

Defendant Miller was assigned as the children's caseworker on September 13, 2004—after the children had been placed in the custody of BCDSS—and was transferred from the case on or about February 15, 2005. Plaintiffs point me to no evidence that suggests Defendant Miller participated in any conspiracy to deprive the Starkeys and the children of their rights in any of the Boulder court proceedings during this time. On September 23, 2004, the

children were adjudicated dependent and neglected without contest. Plaintiffs admit that the children's clinician reported as late at January 27, 2005, that the children were not ready to resume visitation with Stephen Starkey. In fact, Plaintiffs raised only one objection—requesting clarification regarding the content of the apology letters—during the numerous Boulder court proceedings in which Miller was involved.

Under the doctrine of collateral estoppel, the Boulder court's findings for the time period relevant to Defendant Miller—namely, that the children were dependent and neglected, and that separating the children from Stephen Starkey was in the children's best interest—may not be challenged here. The issues of dependency and neglect and the children's best interests are identical to the issues actually litigated and necessarily adjudicated in the Boulder court proceedings; the parties were the same; the Boulder court proceedings resulted in final judgment; and Plaintiffs had a full and fair opportunity to litigate the issues in the prior proceedings. *See Bebo Constr. Co.*, *supra*, 990 P.2d at 84–85. I therefore must accept the Boulder court judge's findings in this regard.

Plaintiffs allege a conspiracy to defraud the Boulder court in the prior matter. Plaintiffs appear to invoke the fraud exception to the collateral estoppel doctrine that instructs this Court not to apply the doctrine when the prior ruling is "procured by the fraud of a party." *See Heiser v. Woodruff*, 327 U.S. 726, 736 (1946); *In re Laing*, 945 F.2d 354, 357 (10th Cir. 1991). As applied to Defendant Miller, however, the only proffered evidence of such fraud or conspiracy is the Boulder court's judgments—judgments which, as previously noted, were not contested by Plaintiffs at the time. This is insufficient evidence of a conspiracy to overcome collateral estoppel for the purposes of this motion for summary judgment.

Plaintiffs allege Defendant Miller placed Jennifer with an unqualified foster parent—Kathy

Grace—for the purposes of converting Jennifer to Defendant Miller's religion. The only evidence supporting this claim is Jennifer's affidavit stating she went to religious services with Grace that contradicted Jennifer's faith and that Defendant Miller told Jennifer "that I should not tell anyone that I had been placed with Ms. Grace, or the judge in my case would not allow me to return home."

With respect to children in foster care, a state is required to make reasonable efforts to accommodate the parents' religious preferences. *See Wilder v. Bernstein*, 848 F.2d 1338, 1346 (2d Cir. 1988). Neither children in need of foster care nor their parents, however, have a constitutional right to have that care provided by someone with the same religion as the unfit parent. *Id.* The overarching purpose of foster care teaches that "the best interests of the child are paramount, and that while parental rights certainly do not cease to exist upon an adjudication of dependency, the parent retains only limited rights to control the religious upbringing of the child and certainly does not retain an absolute right to dictate, at whim, that the child be placed in a setting where he or she will receive instruction in a particular religion." *Walker v. Johnson*, 891 F. Supp. 1040, 1049 (M.D. Pa. 1995).

In light of the Starkeys' unique religious beliefs, accommodating the Starkeys' religious preferences would have been virtually impossible. Stephen Starkey started his own Christian religion that counted only his immediate family as members. Stephen Starkey testified in his deposition that any person who has differing religious beliefs is necessarily "100 percent" biased against his beliefs, although he tempered this statement somewhat in later deposition testimony.

Jennifer was placed with the Grace family—a Christian family of a different denomination. Stephen testified in his deposition that non-fundamentalist Christians such as Grace and Defendant Miller have "taken the faith of Christ, and they've drug it through the mud. They're not Christian.

By any stretch of the imagination, are those people Christian. They're playing some kind of Mickey Mouse game, and it's not Christianity. It's not even religion from what I've heard. It's nonsense." [**Docket # 34-32**]. Stephen Starkey also testified he believed Defendant Miller was evil and that the devil or a demonic force was behind her actions.

Miller's actions in placing Jennifer with a foster family that practiced a different brand of Christianity were not so unreasonable as to amount to a violation of Plaintiffs constitutional rights. Moreover, Plaintiffs provide no evidence from which a reasonable jury could conclude Defendant Miller's alleged statement to Jennifer related to any constitutional violation. Without a properly supported allegation of a constitutional violation, Plaintiffs cannot overcome Defendant Miller's qualified immunity defense. Accordingly, I GRANT summary judgment as to Defendant Miller.

### b. Julie Kintzing

Plaintiffs allege Defendant Kintzing also conspired to deprive the Starkeys and the children of their rights because she disapproved of the Starkeys' religious beliefs. Specific alleged actions demonstrating the conspiracy include: (1) Kintzing told Ft. Logan that Jennifer had been abused by Stephen and had been subject to a "spiritual cleansing" upon her return to Stephen's custody after a ten month hiatus; (2) Kintzing suggested to Jennifer that Stephen had raped her and—upon Jennifer's denial of the same—shouted at Jennifer and told Jennifer and Jennifer's therapist that Jennifer should not defend Stephen; (3) Kintzing tried to place Jennifer in foster care or Koslowski's care despite knowing such placement would be harmful to Jennifer's safety; (4) Kintzing caused Jennifer to be placed on harmful psychotropic medication; (5) Kintzing sought to prevent the Starkeys from discussing religion with the children; and (6) Kintzing issued a finding confirming an allegation of emotional mistreatment and medical neglect as to each of the children

despite the lack of evidence supporting such a finding. Plaintiffs direct me to no evidence supporting these allegations sufficient to overcome a motion for summary judgment.

As to the first allegation, Jennifer's treatment records from Ft. Logan note that Kintzing "expressed deep concern that during [Jennifer]'s stay at her father's, that she had been 'brain washed' religiously by her father who apparently started his own church a number of years ago and is very heavily into religion." [**Docket # 38-3**]. Plaintiffs point me to no evidence that shows Kintzing did anything other than repeat the information she was told by other sources or found in Jennifer's record accumulated before Kintzing was assigned to the case. Kintzing had been informed by Stephen's therapist, Joe O'Cleary, that Stephen believed Jennifer was not having an anxiety attack when she was admitted to the hospital, but instead was experiencing a "conversion ritual" that was common when a person found Christ. O'Cleary also told Kintzing that Jennifer had been "prayed over" for two or three hours the night before the anxiety attack that led to her hospitalization. Kintzing had also been informed by Dr. Stackpool, the Exempla emergency room physician who treated Jennifer, that Jennifer had been subject to a "spiritual cleansing" and that he had been told by Jennifer's mother than Jennifer had been abused. The therapist who evaluated Jennifer at Exempla reported to Kintzing that Jennifer had a "brainwashing dynamic going on." [**Docket # 38-7**]. Officials at Jennifer's school described the Starkeys as "cultish." [**Docket # 38-7**]. The Boulder court found Stephen had abused the children—a finding that cannot be disturbed under the doctrine of collateral estoppel. In light of Kintzing's duty to act in the best interests of the children, *see, e.g., Gomes v. Wood*, 451 F.3d 1122, 1138 (10th Cir. 2006), no material questions of fact remain as to whether Kintzing's actions were objectively reasonable in light of the information she possessed at the time she reported her concerns regarding Jennifer's family background to Ft. Logan. *Hollingsworth*, *supra*, 110 F.3d at 738.

As to the second allegation, while it is unclear whether Kintzing's knowledge of the sexual abuse charge came from Koslowski's statements to Dr. Pinto or some other source, Kintzing's alleged statements do not create a genuine issue of material fact. A fact is only material if it might affect the outcome of a suit under the governing substantive law. *Liberty Lobby*, *supra*, 477 U.S. at 255. Under the substantive law of a § 1983 claim, Plaintiffs have the burden of establishing a sufficient nexus between Defendants' actions and the alleged deprivation of rights. *See Jojola v. Chavez*, 55 F.3d 488, 493–94 (10th Cir. 1995). The sexual abuse allegation was never raised in any court proceeding in which decisions about custody or visitation were made. Accordingly, even if Kintzing did make the statements attributed to her by Jennifer, Plaintiff does not demonstrate a connection between the comments and the alleged deprivation of Plaintiffs' constitutional rights sufficient to raise a material question of fact.

As to the third allegation, the evidence does show—and Defendants do not appear to dispute—that the children had difficulties both in foster care and in Koslowski's care. However, the mere fact that the children's living conditions were not perfect does not show—as Plaintiffs contend—that Defendants' removal of the children from Plaintiffs' home could not have been for the purpose of benefitting the children. It is undeniable that Stephen Starkey was convicted of child abuse, that the children expressed fear of him, that he took the children from their mother in violation of a court order, and that he disobeyed a court order prohibiting unsupervised communication with the children. Plaintiffs again ask me to usurp the findings of the Boulder court as to these facts, which again I will not do under the doctrine of collateral estoppel. While placing the children with their mother or a foster family may not have been the perfect solution, the doctrine of qualified immunity does not require government officials act perfectly, merely that they act reasonably. *Gomes*, *supra*, 451 F.3d at 1137 (citing *Foy v. Holston*, 94 F.3d 1528, 1536

(11th Cir. 1996)) (holding that the defendant officials were entitled to qualified immunity when they placed into foster care a child that alleged abuse by her parents, had bruises on her arm, stated that she did not wish to return to her parents, and threatened suicide; and adding that immunity was not lost "even if the investigation and custody determination procedures were not textbook perfect"). Protective services caseworkers must often choose between difficult alternatives and "it is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it." *Id.* (quoting *van Emrik v. Chemung County Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990). Plaintiffs have raised no genuine issue of material fact demonstrating Kintzing's actions were not objectively reasonable in light of the information she possessed at the time.

As to the fourth allegation, Plaintiffs present no evidence other than the bare allegation itself. The evidence shows that—in the relevant time period—Jennifer was prescribed Seroquel and Zoloft by Mary Hamilton at Ft. Logan and that the medication greatly improved Jennifer's mental health in Hamilton's opinion. Hamilton testified it was "extremely important for [Jennifer] to stay on both medications" for at least six months [**Docket # 34-29**]. Plaintiffs point me to no evidence showing the medication was prescribed as a result of actions or communications on the part of Kintzing, or that the medications were "dangerous and emotionally damaging." During the relevant time period, Jennifer was in the custody of Koslowski and the BCDSS—neither of whom object to Jennifer's medication. Moreover, at the September 21, 2005, hearing, Stephen's attorney made an offer of proof that "Mr. Starkey will testify that he has no problems with the medications that have been prescribed for Jennifer."

As to the fifth allegation, at the September 12, 2005, hearing the Boulder court—after

considering lengthy testimony and argument—found the children were harmed by exposure to the conflicting religious views of Koslowski and the Starkeys. The Boulder court found the children's interests would be best served by restricting the Starkeys from initiating religious dialogue with their children during supervised visits, but did not restrict the Starkeys from discussing religion with the children if the children sought such conversation. The Boulder court clarified its ruling on September 13, 2005, stating: "The Court is not concerned if anything religious occurs during those visits, the Court is only concerned that the children leave those visits feeling cared for, supported, and encouraged by the time spent with the Starkeys." [**Docket # 34-27**]. I will not usurp the Boulder court's findings or orders here.

As to the sixth and final allegation, Plaintiffs repeatedly argue that the fact the children recanted their allegations of child abuse is proof that Kintzing "lied" about the charges when making her recommendations. Even viewing all the evidence in Plaintiffs' favor and accepting the children's alleged retraction as truth, this does not change the fact that Stephen Starkey was convicted of child abuse, that the children expressed fear of him, that he took the children from their mother in violation of a court order, and that he disobeyed a court order prohibiting unsupervised communication with the children. Under the doctrine of qualified immunity, Kintzing's behavior must be interpreted in light of *all* the information available to her when she made her decision. *See Hollingsworth*, *supra*, 110 F.3d at 738. Kintzing was obligated to consider the entire history of this case, not just the children's recent retelling of their story. Plaintiffs have raised no genuine issue of material fact demonstrating Kintzing's actions were not objectively reasonable in light of the information she possessed at the time.

## IV.  STATE CLAIMS

Having granted summary judgment to all defendants on Plaintiffs' § 1983 claim, I now

turn to the proper disposition of the pendent state law claims.  Generally in a case considered on federal question jurisdiction, the dismissal of all federal claims—leaving only state law claims—prevents me from reviewing the merits of the state law claims.  *McWilliams v. Jefferson County*, 463 F.3d 1113, 1117 (10th Cir. 2006).  I may retain pendent jurisdiction, however, if Plaintiffs demonstrate by a preponderance of the evidence that the interests of judicial economy, convenience, and fairness to the parties so require.  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Karnes*, 335 F.3d at 1194; *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995).  The burden is high where, as here, the federal claims are dismissed before trial.  *Gibbs*, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").

My order granting summary judgment in favor of Defendants on Plaintiffs' § 1983 claims extinguishes any basis for federal question jurisdiction.  *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1236 (10th Cir. 1998).  Plaintiffs' remaining claims rest on issues of Colorado law. Under the well-established doctrine of comity to the states—and particularly in light of the fact that a branch of the Colorado state government is involved in this action—Colorado courts have an interest in enforcing their own laws that weighs heavily in favor of dismissal.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 352 (1988).

Although the parties to this case have engaged in considerable discovery and motions practice before this Court, the fruits of these endeavors are available to the parties at the state level.  In the interests of judicial economy, convenience, and fairness to the litigants, I find no compelling reason why federal jurisdiction should be retained.

## V.  CONCLUSION

Accordingly, for the reasons set forth above, I GRANT in part and DENY in part

Defendants' Motion to Strike Sham Affidavits [**Docket # 41**] and GRANT in part and DENY

Defendants' Motion for Summary Judgment [**Docket # 34**] as follows:

1. The affidavits of Stephen Starkey [**Docket # 38-2**], Jennifer Starkey [**Docket # 38-10**], and Bedra Starkey [**Docket # 38-11**] are redacted as stated herein;

2. Plaintiffs' Rule 56(f) motion [**Docket # 38-13**] is DENIED;

3. Defendants' motion for summary judgment [**Docket # 34**] is GRANTED as to Plaintiffs' § 1983 claims and this claim is DISMISSED WITH PREJUDICE as to all Defendants. Defendants are AWARDED their costs incurred in defending this claim.

4. The remaining claims in this case are DISMISSED WITHOUT PREJUDICE for lack of jurisdiction.

Dated: December __17__ 2007.

BY THE COURT:

_____s/Lewis T. Babcock_____
Lewis T. Babcock, Judge